## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SPEYSIDE MEDICAL, LLC,

      Plaintiff,

v.

MEDTRONIC COREVALVE, LLC and
MEDTRONIC, INC.,

      Defendants.

C.A. No. 20-361-GBW-CJB

---

### MEMORANDUM ORDER

In this patent infringement action between Plaintiff Speyside Medical, LLC ("Speyside" or "Plaintiff") and Defendants Medtronic Corevalve, LLC and Medtronic, Inc. ("Medtronic" or "Defendants"), Magistrate Judge Burke held a *Markman* hearing and issued a Report and Recommendation (D.I. 289, the "Report") recommending that the Court adopt constructions for seven disputed claim terms in United States Patent Nos. 8,377,118 (the "'118 patent"), 9,510,941 (the "'941 patent"), 10,449,040 (the "'040 patent"), and 9,445,897 (the "'897 patent"). Both parties filed objections to the Report. D.I. 295; D.I. 296.

The Court has reviewed the Magistrate Judge's Report, the objections and the responses thereto, and has considered *de novo* the original claim construction briefing and supporting documents, as well as the transcript of the claim construction hearing. *See, e.g., St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.,* 691 F. Supp. 2d 538, 541-42 (D. Del. 2010); 28 U.S.C. § 636(b)(l); FED. R. CIV. P. 72(b)(3). For the reasons set forth below, Speyside's and Medtronic's objections to the Report are **OVERRULED** and the Report is **ADOPTED**.

1

## I.   LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention"). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although subsidiary fact-finding is sometimes necessary. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1312–13). A person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

"When construing claim terms, the court first looks to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013). "Other claims of the patent in question, both asserted and unasserted,

can . . . be valuable" in discerning the meaning of a disputed claim term because "claim terms are normally used consistently throughout the patent," and so, "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. In addition, "[d]ifferences among claims can also be a useful guide[.]" *Id.* For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition to the claim, the Court should analyze the specification, which "is always highly relevant to the claim construction analysis ... [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)). And, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution[.]" *Phillips*, 415 F.3d at 1317.

In some cases, the Court "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks and citations omitted).

## II.   DISCUSSION

### A.   Speyside's Objections

#### 1.   "substantially equal to or less than"

The Report recommends construing "substantially equal to or less than" to mean "equal to or less than." D.I. 289 at 39. Speyside argues that the Report makes the following two errors in reaching its recommendation: "First, the Report misinterprets statements made by Speyside's counsel in the [*inter partes* review ("IPR")] proceedings. Second, the Report improperly elevates the impact of those statements to make an erroneous finding that they meet the 'clear and unmistakable' standard for prosecution disclaimer." D.I. 296 at 3.

The Court has carefully reviewed the record regarding the construction of "substantially equal to or less than" *de novo* as well as the Report. The Court agrees with the Report's summary of the IPR proceedings at issue, D.I. 289 at 6-11, and the Report's ultimate recommendation that Speyside clearly and unmistakably disclaimed claim scope of "substantially equal to or less than" during the IPR proceedings at issue, *id.* The Report concluded:

> It is true that in [Speyside's written IPR Response ("POR")] and in its initial comments at the hearing, Speyside used the "substantially equal" language in arguing that Medtronic had not addressed the amount of lengthening of the

4

Leonhardt stent (and whether that amount fell within the scope of the claim language). But then at the hearing, Speyside's counsel argued repeatedly that the length of the stent in Leonhardt becomes longer in the movable configuration, and stated that this falls outside the scope of the claim limitation. ([D.I. 183] at 12-15, 99) That is, Speyside told the PTAB—clearly and unmistakably—that the claims require that when the carrier element is collapsed, it "stays the same length or becomes shorter" than the length of the carrier element in the first expanded configuration. (D.I. 170, ex. 2 at 39) And its counsel then twice—again, clearly and unmistakably—emphasized this same point in a different way. Counsel stated that when the stent of Leonhardt is collapsed, it "become[s] longer" than the length of the stent in the first expanded configuration, which is "exactly the opposite of what[ is] required by the claims." (*Id.* at 38-39, 42-43) In other words, Speyside's counsel was surely conveying that the claims at issue do not allow for the length of the carrier element to become "longer" in the movable configuration—they allow for the "opposite" of that (i.e., claims where this length becomes shorter, or at most, stays the same). In light of these statements, a claim construction reflecting Speyside's disclaimer (i.e., "equal to or less than") is warranted here. *See, e.g., CliniComp Int'l, Inc. v. Cerner Corp.*, Case No.: 17-cv-02479-GPC (DEB), 2022 WL 3006343, at *7 (S.D. Cal. July 28, 2022) (agreeing with the defendant that the plaintiff's several statements made during the IPR hearing "to distinguish claim 1 of the '647 patent from the Johnson prior art reference" constituted a clear and unmistakable disclaimer).

D.I. 289 at 9-10 (footnotes omitted).

Given the detailed reasoning provided in the Report, the Court finds it unnecessary to address objections any further.[1] Accordingly, having reviewed the record *de novo*, the Court agrees with the Report's ultimate recommended construction of "substantially equal to or less than," and Speyside's objections to this term are overruled.

### B.  Medtronic's Objections

#### 1.  "interlocking locking mechanism"

The Report recommends construing "interlocking locking mechanism" to mean "portions that lock the prosthetic valve, and that are entirely located on the prosthetic valve." D.I. 289 at 39.

---

[1] In its response, Medtronic argues that it "appears that Speyside is going to put forth an infringement argument that is contrary to both its disclaimer and the [Report]." D.I. 300 at 7. The Court declines to address the merits of this argument in this Memorandum Order.

Medtronic maintains that this term should mean "a part that fits into another part to lock."  D.I. 295 at 1-6.

Medtronic disagrees with the Report's analysis of the prosecution history.  *See id.* at 2-4. The Court has carefully reviewed the record regarding the construction of "interlocking locking mechanism" *de novo* as well as the Report and agrees with the Report's interpretation of the prosecution history.  *See* D.I. 289 at 22-24.  The Court also agrees with the Report's conclusion that the Report's construction of this claim term is consistent with the plain language of the claims and disagrees with Medtronic that "the [Report] improperly reads the word 'interlocking' out of the claim altogether," D.I. 295 at 2.  *See* D.I. 289 at 23-24.

Lastly, the Court agrees with the Report's conclusion that the Report's recommended construction of this claim term is consistent with the '040 patent specification.  *Id.* at 24-26.  The Report provided detailed analysis of the intrinsic evidence and the arguments put forth by the parties.  The Court agrees with the Report's analysis and reasoning of the intrinsic evidence and the Report's recommended construction.  Accordingly, the Court upon *de novo* review agrees with the Report's conclusions and Medtronic's objections to the construction of "interlocking locking mechanism" are overruled.

### 2.    "hemostasis valve assembly"

The Report recommends construing "hemostasis valve assembly" to mean "a valve assembly configured to minimize blood loss during percutaneous procedures."  D.I. 289 at 39. Medtronic argues that the Report "erroneously disregards" three points: "(1) the principal that two terms used in a patent have different meanings; (2) the patent specification, which clearly distinguishes 'seals' and 'valves'; and (3) the prosecution history, during which the patentee explicitly changed the claim term 'hemostasis *seal* assembly' to 'hemostasis *valve* assembly' to overcome a rejection."  D.I. 295 at 7 (emphasis in original).  The Court disagrees.  In fact, the

Report considered these three points and rejected them. D.I. 289 at 26-31. For example, the Report

states:

> Medtronic's arguments—i.e., that the proper term for construction is simply "valve
> assembly[,]" and that this phrase must be defined differently than "seal assembly"
> (with the former selectively controlling blood flow and the later passively blocking
> blood flow)—are not persuasive. (D.I. 119 at 58) For example, Medtronic asserts
> that the specification discloses "seal assembl[ies]" and a "hemostasis seal" that
> "passively block[] blood flow without selective control over whether blood flows
> or the direction of blood flow." (*Id.* (citing '897 patent, cols. 20:26-31, 24:58-62
> (describing a "hemostasis seal" that can be "provided between the inner and outer
> tubular members" and "disposed in outer sheath handle" and the "seal assembly
> 1042" described above); Tr. at 201-02) And that may be so. But Medtronic cites to
> nothing from the patent that supports the idea that a "hemostasis valve assembly"
> *cannot also* seal off blood flow.
>
> Medtronic also cites to portions of the specification that it contends refer to valves
> as "involving selective control of blood flow"—in contrast to the specification's
> description of "seals." (D.I. 119 at 59 (citing '897 patent, cols. 1:39-43 (explaining
> that the "valves of the heart . . . function to ensure that blood flows in only one
> direction through the heart"), 7:3-9 (noting that a tissue valve can be configured
> with an "'open'" configuration where blood can flow through the implant in a first
> direction and a "'closed'" configuration whereby blood is prevented from back
> flowing through the valve in a second direction), 8:62-9:2 (referring to "valve
> systems that allow for pressurization without leakage or passage of fluid in a single
> direction"))) Yet while these cited portions of the specification refer to a "valve" or
> "valves," the portion of the claim at issue here is not "valve"—it is "hemostasis
> valve assembly." And, as noted above, when the patent actually discusses a
> "hemostasis valve" it: (1) refers to it as a hemostasis "seal/valve"; and (2) never
> says anything about this "seal/valve" minimizing blood loss only by selectively
> controlling the flow of blood. By referring to the structure as a "seal/valve" in the
> specification, the patentees are clearly indicating that, at least in the context of the
> claimed hemostasis assembly structure, "seal" and "valve" could well mean the
> same thing.

*Id.* at 28-29 (footnotes omitted).

Medtronic's prosecution history objection—that the "prosecution history bolsters the

conclusion that valve and seal are not coextensive or interchangeable in this context," D.I. 295 at

9—was also addressed and rejected by the Report. D.I. 289 at 29-31. The Report concluded:

> In the end, while it is true that the applicant did change the term "seal" to "valve"
> during prosecution . . . , that does not mean that the Court must construe the claim
> term at issue to require only the selective control of blood flow. In explaining the

reasons for the claim alterations, neither the applicants nor the Examiner appeared to comment on or put any emphasis on the change from "seal" to "valve." (D.I. 119 at 62) Therefore, nothing in the prosecution history provides a clear enough statement sufficient to undercut the Court's conclusion above that: (1) the patent specification clearly indicates that the claimed hemostasis valve assembly can encompass a structure that seals off or blocks the flow of blood; and (2) the patent does not otherwise suggest that such an assembly must only "selectively control[] the flow of blood."

*Id.* at 31.

Given the detailed reasoning provided in the Report, the Court finds it unnecessary to address objections any further. Accordingly, having reviewed the record *de novo*, the Court agrees with the Report's conclusions regarding the claim term "hemostasis valve assembly," and Medtronic's objections to this term are overruled.

\* \* \*

NOW THEREFORE, IT IS **HEREBY ORDERED** on August 22, 2023 that:

1.    Speyside's Objections (D.I. 296) to the Report are **OVERRULED**;

2.    Medtronic's Objections (D.I. 295) to the Report are **OVERRULED**;

3.    The Report (D.I. 289) is **ADOPTED**; and

4.    The parties shall submit for the Court's signature no later than August 25, 2023 a Claim Construction Order consistent with this Memorandum Order and the Magistrate Judge's claim constructions to which the parties did not object.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE